## Richmond

## STATE HIGHWAY AND TRANSPORTATION COMMISSIONER OF VIRGINIA

v.

## THE EDWARDS COMPANY, INCORPORATED, etc.

June 8, 1979.

Record No. 770800.

Present: All the Justices.

*Valentine W. Southall, Jr., Assistant Attorney General (Anthony F. Troy, Attorney General; Walter A. McFarlane, Deputy Attorney General, on briefs), for plaintiff in error.*

*B. M. Millner (Svein J. Lassen; Robert W. Curran; Marshall, Blalock, Garner & Millner, on brief), for defendant in error.*

HARMAN, J., delivered the opinion of the Court.

The State Highway and Transportation Commissioner of Virginia (Commissioner), under Code § 25-46.17, has perfected this appeal from the trial court's ruling on preliminary issues which arose in the Commissioner's condemnation action against property of The Edwards Company, Incorporated (Edwards or the landowner).

While a number of issues are raised and discussed on brief and at oral argument, we need consider only two dispositive questions.

These are:

(1) Whether the trial court erred in holding that a railroad siding, a coal unloading pit, a coal conveyor control house, yard lights, a wagon or truck scale, advertising signs, underground storage tanks and a coal conveyor system located on the landowner's property were personal property; and

(2) Whether the trial court erred in enjoining and staying further proceedings in the Commissioner's condemnation action until such time as the landowner's rights had been determined under The Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1972, Code §§ 25-235 *et seq.* (Relocation Assistance Act).

Edwards is a distributor of coal and fuel oil in Newport News. Since 1921 this business has been conducted from an office and storage yard on 24th Street in that city. Edwards acquired title to the property in 1923 or 1924. This lot was approximately 200 feet square and fronted on 24th Street. The rear line of the lot was the northern right-of-way line of 23rd Street, a dedicated but unpaved street which was subjected to little use.

The Commissioner, in order to widen and reconstruct 23rd Street, deemed it necessary to acquire the southern 50 feet of the landowner's property, together with a temporary easement during construction. When negotiations between the landowner and agents of the Commissioner produced no agreement, the Commissioner filed a certificate of deposit on November 18, 1975, in the sum of $69,800 and, under Code § 33.1-119, acquired defeasible title to 0.23 of an acre of Edwards' land and the construction easement. The Commissioner filed a petition for condemnation on December 3, 1975, and the trial court appointed trial commissioners on January 23, 1976.

At a time which is unclear from the record, a dispute arose between the landowner and Commissioner as to whether certain property used in the landowner's business was realty or personalty. Some of the disputed items were located upon the portion of landowner's land taken by the Commissioner and the remainder on property which the landowner retained. It was the landowner's contention that the disputed items were personal property and, therefore, were not subject to condemnation. It further contended it was entitled to have this property moved under the Relocation

Assistance Act. It was the Commissioner's position that the disputed items of property were fixtures upon the land and that they were, therefore, realty.

In support of this position the Commissioner filed an amended and supplemental certificate of deposit describing the same land set forth in the original certificate and, in addition, enumerating most of the disputed items as property taken by the certificate.

The trial court, after evidentiary hearings, held the disputed items were personal property and not subject to condemnation.* The trial court restrained and enjoined the Commissioner from entering upon or taking possession of the property acquired by certificates, or from proceeding further in his condemnation action until such time as Edwards' rights under the Relocation Assistance Act had been determined by a court of competent jurisdiction.

In considering the first issue, *i.e.*, whether the disputed items were real or personal property, it is necessary that we briefly review the evidence which is in the record.

The first item, 200 feet of railroad track or siding, was all within that portion of the land described by the certificate. When Edwards acquired title to its property, a railroad siding, which had already been constructed on its lot, was conveyed to Edwards, with the grantor reserving the use of the siding for the benefit of its adjoining lots. Likewise, Edwards was granted an easement over that portion of the siding located on the grantor's other property. The railroad siding was maintained and some of the rails and ties were replaced from time to time at Edwards' expense. It is constructed in the usual manner with rails affixed to ties set into a prepared roadbed. D. B. Edwards, an officer and major owner of Edwards, testified that he always considered the siding to be personal property because it was part of "our machinery" and because Edwards could "pull it up,. . . move it [or] . . . do anything we want with it." On cross-examination, however, the witness admitted that it was his intent that the track "stay there" although the landowner, by contract documents, "did guard against the possibility of [the track] being moved."

The coal unloading pit, coal conveyor control house and coal

---

*In view of our subsequent holdings, we do not reach the question whether personal property is subject to condemnation by the Commissioner.

conveyor system are parts of an automated system for unloading coal from railroad cars and moving it to storage areas from which it is later delivered to Edwards' customers. The system was first installed in 1932 and it had been updated and repaired from time to time. The pit is an underground concrete structure to receive coal when the unloading doors of a railway coal car are opened. The conveyor consists of a hopper or bucket which travels on a series of cables and pulleys between the unloading pit and the stockpiles maintained in Edwards' yard for different grades and sizes of coal. The cables and pulley system were originally attached to a wooden trestle, later replaced by a steel trestle, which is bolted to concrete piers embedded in the ground. Controls for the coal conveyor system are located in a small masonry house adjoining the unloading pit. While conceding that the coal conveyor control house, pit and foundations supporting the steel trestle were "put there to stay", D. B. Edwards testified that the rest of the system was constructed so it "could be moved".

The twenty-ton wagon or truck scales are inside and affixed to a building constructed to enclose them. D. B. Edwards testified that the company "[b]uilt an office all around [the scales]."

D. B. Edwards also testified that the advertising signs, yard lights and underground storage tanks were all movable and could be relocated if landowner moved to another site. All the storage tanks are buried in the earth. At least one of them is covered by concrete pavement. The record is otherwise silent regarding the advertising signs and yard lights.

Based upon well established legal principles, we hold that the trial court erred in finding the disputed items to be personal property and not real fixtures.

■ Three tests are applied in order to determine whether an item of personal property upon realty itself becomes realty. They are: (1) annexation of the property to the realty, (2) adaptation to the use or purpose to which that part of the realty with which the property is connected is appropriated, and (3) the intent of the parties. The intent of the party making the annexation is the chief test to be considered in determining whether the chattel has been converted into real property. *Transco Corp.* v. *Prince William County*, 210 Va. 550, 555, 172 S.E.2d 757, 761-62 (1970).

In *Danville Holding Corp.* v. *Clement*, 178 Va. 223, 232, 16 S.E.2d

345, 349 (1941), where we considered and discussed the three tests mentioned above, we said:

> "While, under the first test, there must be actual or constructive annexation, the method or extent of the annexation carries little weight, except insofar as they relate to the nature of the article, the use to which it is applied and other attending circumstances as indicating the intention of the party making the annexation.

> "The second test—adaptation of the chattel to the use of the property to which it is annexed—is entitled to great weight, especially in connection with the element of intention. If the chattel is essential to the purposes for which the building is used or occupied, it will be considered a fixture, although its connection with the realty is such that it may be severed without injury to either.

> "The intention of the party making the annexation is the paramount and control-ling consideration. The test of intention is given a broad signification. It does not imply a secret, undisclosed action of the mind of the owner of the property. The intention need not be expressed in words; it may be inferred from the nature of the article affixed, the purpose for which it was affixed, the relationship of the party making the annexation and the structure and mode of annexation. 22 Am. Jur., Fixtures, section 6; 26 C.J., Fixtures, sections 2 and 3; 11 R.C.L., Fixtures, section 6."

■ Here, the record shows that for more than a half century the landowner's land had been used and adapted to the conduct of its business as a distributor of coal and fuel oil. All the disputed items were a part of its machinery and equipment and were all adapted to and used for the purpose to which the property was devoted, the operation of Edwards' business.

The railway siding had been in place for more than 50 years and the coal conveyor system had been in use for more than 40 years.

The scales are completely enclosed within a structure erected for that purpose by the landowner. The storage tanks are embedded in the earth and at least one of them is covered by concrete pavement. These facts and circumstances are strong indicia of the landowner's permanency of enterprise and, we believe, conclusively establish Edwards' intent to make such machinery and equipment a permanent accession to its realty despite landowner's present disavowals of such intent. It follows, therefore, that the items of property in question became and are real fixtures.

■ It also follows that the trial court erred in staying the condemnation proceedings and enjoining the Commissioner from entering upon or taking possession of the property acquired under the certificates. The disputed items, as real fixtures, can unquestionably be acquired for public use by the Commissioner under his right of eminent domain. The landowner is, of course, entitled to just compensation and damages as guaranteed by Article I, § 11 of the Constitution of Virginia (1971) since its property has been taken and damaged for public use by the Commissioner.

■ While the landowner may be entitled to additional rights and benefits under the Relocation Assistance Act, these rights and benefits are entirely separate and distinct from the landowner's constitutional right to just compensation and damages in a condemnation proceeding. To recover benefits under the Relocation Assistance Act, a qualified "displaced" person must pursue his remedies under that act since the General Assembly has provided in Code § 25-235.1(b):

> "Nothing in this chapter shall be construed as creating in any condemnation proceedings brought under the power of eminent domain, any element of value or damage not in existence immediately prior to [the effective date of this chapter.]"

Accordingly, the order appealed from will be reversed, the injunction will be dissolved and the case will be remanded for trial on the issue of just compensation and damages.

*Reversed and remanded.*