The CHESAPEAKE AND POTOMAC TELEPHONE COMPANY OF VIRGINIA, Appellant,

v.

Moon LANDRIEU, in his official capacity as Secretary of Housing and Urban Development, and Norfolk Redevelopment and Housing Authority, Appellees.

No. 81–1602.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 7, 1981.

Decided March 25, 1982.

---

Joseph L. Kelly, Jack E. Greer, Norfolk, Va. (Williams, Worrell, Kelly & Greer, Norfolk, Va., on brief), for appellant.

Francis N. Crenshaw, Norfolk, Va. (Ann K. Sullivan, Crenshaw, Ware & Johnson, Justin W. Williams, U. S. Atty., Michael L. Rhine, Asst. U. S. Atty., Sonia C. Jaipaul,

John R. Abbot, Peter M. Campanella, Norfolk, Va., on brief), for appellees.

Before HAYNSWORTH, Senior Circuit Judge, and RUSSELL and WIDENER, Circuit Judges.

HAYNSWORTH, Senior Circuit Judge:

The questions are whether a utility company can qualify as a "displaced person" under the Uniform Relocation Assistance and Real Property Acquisition Policies Act, 84 Stat. 1894, 42 U.S.C. § 4601 et seq., and whether the plaintiff, Chesapeake & Potomac Telephone Company (C&P), qualifies as a "displaced person" under the facts of this case.

The Department of Housing and Urban Development (HUD) provided funds for the Norfolk Redevelopment and Housing Authority (NRHA) to carry out certain redevelopment projects in Norfolk, Virginia. In order to carry out these projects NRHA acquired title to certain blighted areas in Norfolk. Because of these projects, C&P was forced to move certain of its telephone lines, cables, conduits, poles and related equipment from what had been streets in Norfolk. Under C&P's franchise agreement with the City of Norfolk, C&P was required to move its lines from public rights-of-way whenever requested by the city to do so.

After moving its lines, C&P requested relocation benefits under the Uniform Relocation Act. C&P's claims were denied at the administrative level. C&P then brought this action in the district court against the Secretary of HUD and NRHA.

After a trial on the liability issue, the district court determined that Congress did not intend for utilities to qualify as displaced persons under the Act. The plaintiff appeals from this order.

## I.

The Uniform Relocation Act defines "displaced person" as "any person who . . . moves . . . as a result of the acquisition of . . . real property . . . for a program or project undertaken by a Federal agency, or with Federal financial assistance . . . ." 42 U.S.C. § 4601(6). "Person" is defined as "any individual, partnership, corporation or association." 42 U.S.C. § 4601(5). "Business" is defined as "any lawful activity, excepting a farm operation, conducted primarily—(A) for the purchase, sale, lease and rental of personal and real property, and for the manufacture, processing, or marketing of products, commodities, or any other personal property; (B) for the sale of services to the public . . . ." 42 U.S.C. § 4601(7). Under 42 U.S.C. § 4622(a) "displaced persons" are entitled to recover from the government any reasonable expenses incurred in moving personal property, and a business required to move is a displaced person.

The plaintiff argues that it is a business within the meaning of the Act and thus is entitled to claim reimbursement for expenses as a displaced person. NRHA and HUD argue, however, that the Act was not intended to apply to utilities. HUD bases its argument on the settled common law principle that utilities are not entitled to reimbursement for expenses incurred in moving lines when cities close streets. Because the Act does not explicitly mention utilities as parties that can receive benefits under the Act, and because the legislative history of the Act makes no mention of utilities, HUD argues that the Act was not intended to change the common law. We disagree.

HUD's reliance on the common law is unconvincing. The Act was intended to create rights that were not recognized at common law. A tenant at will, for example, can recover relocation expenses as a displaced person under the Act even though the common law recognized no such right. The plaintiff in this case is, in certain respects, similar to a tenant at will because it has a right to use the city's streets for its lines only at the will of the city.

Congress' failure to mention utilities during the debates on the Act and in the legislative history of the Act also provides little reason to exclude utilities from the Act's coverage. In *Alexander v. United*

*States Department of Housing and Urban Development*, 441 U.S. 39, 51, 99 S.Ct. 1572, 1581, 60 L.Ed.2d 28 (1979), the Supreme Court noted that the original "Declaration of Policy" in S.1, 91st Cong., 1st Sess. § 201 (1969), the bill finally enacted as the Uniform Relocation Act, stated that the purpose of the legislation was

> "to establish a uniform policy for the fair and equitable treatment of owners, tenants, and others displaced by the acquisition of real property in Federal and federally assisted programs to the end that such person shall not suffer disproportionate injuries as a result of programs designed for the benefit of the public as a whole."

Similar language is contained in the House Report, H.R. 91–1656 (1970), U.S.Code Cong. & Admin.News 1970, p. 5850. Thus the Act was intended to extend benefits uniformly to persons who are displaced by federal acquisitions of real property for federal programs. Exclusion of utilities from the Act's coverage would run counter to that purpose.

█ In the absence of any clear legislative intent to exclude utilities, it is this court's duty to apply the literal language of the statute. Doing so, we find that a utility comes within the Act's definition of "business" and thus is a "displaced person" under the Act.

## II.

HUD contends that the removal of its lines by C&P was not the result of federal acquisition of the real estate. It says that the removal was required by the city's closure of the streets.

█ Under the statute, relocation expenses are payable if the removal was required "as a result of the acquisition of . . . real property, in whole or in part . . ., for a program or project undertaken by a Federal agency, or with Federal financial assistance . . . ." It is true that the city closed the streets, but the removal seems clearly to have been required as a result of the federal acquisition of the real estate.

With respect to most of the relocation costs incurred by C&P, they occurred in situations in which NRHA acquired the land abutting both sides of streets. As a result of those acquisitions, the project became the owner of the title in fee simple to the land underlying the streets, subject to the city's easement to maintain them as public ways. At the request of NRHA, the city then released its easements so that NRHA became the owner of the land formerly dedicated to use as streets without the burden of that servitude. While in a very technical sense it may have been the city that closed the streets, the city was acting at the direction or request of HUD and NRHA. It was an essential part of the plan of the project that the land occupied by the streets to be closed be acquired free of the city's easement so that such land could be incorporated in the redevelopment plan to the same extent as lands acquired, by purchase or condemnation, from private owners. It was the federal acquisition of the streets, an integral part of the redevelopment plan, which required removal of C&P's lines.

█ Some of the removal expense was incurred with respect to lines in streets that were to be widened and other streets which were only partially closed. The record is not sufficient to permit us to decide whether those expenses resulted in whole or in part from the federal acquisition. This should be the subject of further consideration on remand.

## III.

Under 42 U.S.C. § 4622(a), it is the expense of removal of personal property which is reimbursable, and HUD contends that the utility lines were realty. Its regulations require that what is personal property be determined according to the law of the state in which the property is located,[1] and it relies upon *Transcontinental Gas Pipe Line v. Prince William County*, 210 Va. 550, 555, 172 S.E.2d 757, 761–62 (1970).

In *Transcontinental*, gas pipe lines had been installed in land in which Transcontinental had a perpetual easement for the

---

1. 24 C.F.R. § 42.40(m)(2).

placement, maintenance and operation of the gas line. The easement was unquestionably real property, belonging to the owner of the lines. Under those circumstances, the Virginia Supreme Court held that the gas lines themselves were real estate belonging to Transcontinental. In so doing, it held that the question whether a chattel annexed to real estate has been converted into a fixture principally depends upon the intention of the party making the annexation.

▪ C&P, in placing its lines, could hardly have intended them to become so annexed to real estate belonging to others that the lines themselves became the real property of those other owners. Clearly it intended to maintain ownership and control of these lines which were not annexed to any real estate owned by C&P of which they might have become a part. Indeed, everyone recognized C&P's right of removal of property which could only have been its personalty.

In similar situations in which a utility's facilities were installed or attached to real estate belonging to others, state courts have found that the facilities remained personal property. *See Bangor-Hydro Electric v. Johnson*, 226 A.2d 371 (Me.1967); *United Electric Light v. Deliso Const. Co.*, 52 N.E.2d 353 (Mass.1943).

▪ HUD and NRHA, however, point to a letter that C&P wrote to the Virginia Commissioner of Revenue requesting that its property be taxed as real property. That it wished its facilities to be treated for purposes of ad valorem taxation as if they were realty is not inconsistent with an intention at the time of installation that the facilities remain its personal property subject to its control and possible removal. Indeed, if the facilities had become part of the real estate to which they were attached, C&P should have been subject to no ad valorem taxation upon them, for they would not have been the property of C&P.

This result is consistent with the purpose of the personal property limitation. The former owners of land acquired for the redevelopment project are compensated through a purchase agreement or a condemnation proceeding. By agreement, there might be a severance of a fixture and its reconversion to personalty, but once real estate has been sold and paid for, it is no longer subject to removal by the former owner. The Act thus contemplates no reimbursement of expense in connection with the removal of nonremovable real estate. It is limited to the expense of removal of personal property, for the owner is not otherwise compensated for that expense. There is no possibility of double compensation here, for C&P did not sell any land, and it received no compensation through any sale or condemnation.

### IV.

We reverse and remand this case for further proceedings consistent with this opinion.

REVERSED AND REMANDED.